IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| STEPHEN RAMSAY, | * | CHAPTER 7 |
|     Debtor | * | |
| | * | CASE NO. 1:09-bk-06658MDF |
| ROBERTA A. DeANGELIS, | * | |
| ACTING UNITED STATES TRUSTEE, | * | |
|     Movant | * | |
| | * | |
|     v. | * | |
| | * | |
| STEPHEN RAMSAY, | * | |
|     Respondent | * | |

## OPINION

Before me is the Motion of the United States Trustee ("UST") to dismiss the chapter 7 bankruptcy case of Stephen Ramsay ("Debtor") under 11 U.S.C. §707(b)(3). The UST argues that granting Debtor relief under chapter 7 would constitute abuse because Debtor can afford to repay a significant proportion of his unsecured debt through a chapter 13 plan. The UST's argument is based largely on the allegation that Debtor's mortgage and vehicle expenses are excessive. The UST also avers that Debtor underreported his monthly income on schedule I. Debtor responds that his mortgage expense is not excessive, considering the size of his household, and that his vehicle expense is reasonable due to the commuting requirements of his job. He further asserts that schedule I was accurate when filed and that any perceived under-reporting is due to the variability of his income from month to month.

An evidentiary hearing was held on January 11, 2010. The matter is now ripe for decision.[1]

---

[1] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A). This Opinion constitutes findings of fact and conclusions of law required to be made by Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

## I. Factual Findings

Debtor is a divorced father of two minor children. On the date he filed his chapter 7 petition, Debtor resided with his sixteen-year-old daughter, his fiancé, and his fiance's three minor children. Debtor's minor son (whose age is not specified in the record) lives with him approximately three months during the year. Debtor's fiancé is not employed and has been without employment for seven years.

In 2006, Debtor and his former wife relocated to Hershey, Pennsylvania from Las Vegas, Nevada. They purchased a home in June of that year for approximately $530,000. At the time the home was purchased, Debtor working as an airline pilot, flying out of John F. Kennedy International Airport in New York. Debtor's annual salary at the time he and his wife purchased the home in Hershey is not of record.[2] After they relocated, Debtor's former wife obtained employment as an executive assistant earning approximately $35,000 a year. Two months after purchasing the home, Debtor suffered a "disability"[3] that rendered him unable to work. He received disability income from his employer from August 2006 to August 2008, after which he was able to resume flying. During the two-year period Debtor was receiving disability payments, his income was significantly lower than when he was working as a pilot. In 2007, Debtor's individual income was $44,630, slightly more than half of what he earned in the prior year. Adding to his financial woes, Debtor and his wife separated in October 2007, and she moved

---

[2]Debtor's federal income tax return reported gross income of $84,000, but Debtor was on disability for five months of that year.

[3]The nature of Debtor's disability is not disclosed in the record.

2

Case 1:09-bk-06658-MDF    Doc 26    Filed 08/12/10    Entered 08/12/10 15:04:27    Desc
                          Main Document         Page 2 of 18

out of the marital home. In May 2008, Debtor's fiancé and her three children moved in with Debtor.

During his period of disability, Debtor partnered with a friend to start a "real estate company." Although Debtor's testimony on the activities of this company was vague, the Court deduced that it primarily performed services as a mortgage broker.[4] This venture ultimately failed during the downturn in the nationwide real estate market that began in 2008. In July 2009, Debtor and his former wife divorced. Debtor filed his bankruptcy petition shortly thereafter on August 8, 2009.

Debtor continues to reside in the former marital home, which he valued in schedule A at $500,000 with a mortgage balance of $532,102. The home has four bedrooms and consists of approximately 3,000 square feet of living space. Mortgage payments on the home are $3651 per month.[5] In August 2007, Debtor listed the home for sale at $570,000. He testified that he set the price above market value because he was "trying to break even" after paying off the mortgage, "real estate fees, taxes, and all that stuff." (N.T. 15.) Debtor received no offers of purchase during the listing period and removed the property from the market rather than reduce the asking price.

The same month they put their house on the market, which was two months before they separated, Debtor and his former wife purchased two new motor vehicles – a 2007 Chevrolet Uplander and a 2007 Cadillac Escalade.[6] Debtor testified that these vehicles were purchased to

---

[4] Debtor testified that "we were doing mortgages with a mortgage company [and] . . . quite a bit of title work." (N.T. 25).

[5] Debtor's first mortgage payment is $3,325.97 a month and his second mortgage payment is $325.20 a month.

[6] The purchase price of the Escalade was $58,000.

3

replace a "BMW, Volvo and a Porsche 9111 Carrera 4S," which were traded in when the Uplander and Escalade were purchased. (N.T. 11.) These transactions enabled Debtor and his wife to reduce their monthly vehicle payments from approximately $1900 to $1431. Under the terms of the divorce decree, the Uplander is in the possession of Debtor's ex-wife, who is obligated to make the monthly loan payments of $304, although Debtor remains the obligor on the loan. Debtor testified that he frequently makes the payments on his former wife's vehicle when she is unable to do so. Debtor has exclusive possession and use of the Escalade, which has monthly payments of $1128.[7]

Debtor's original schedule I stated that his gross monthly income was approximately $8400,[8] which includes $850 a month in support payments owed to his fiancé by her former spouse. On January 5, 2010, Debtor filed an amended schedule I showing gross monthly income of $9526. At the hearing, the UST amended its motion and concurred in the amount shown as Debtor's gross monthly income on amended schedule I. Debtor's pay statement of October 9, 2009 reports $66,191 in net income for the year to date, or $7354 in net income per month. By comparison, schedule I filed with Debtor's petition states that his net monthly income is only $6087. Debtor's amended schedule I reflects net monthly income of $6967. At the hearing, the UST amended its motion concurring in the net monthly income reported on Debtor's amended schedule I.

---

[7] At the hearing, Debtor testified that the monthly payment on the Escalade was $1147. (N.T. 11.) Based upon Debtor's Exhibit 6 and Debtor's further testimony, the Court finds that the correct figure is $1127.93.

[8] This figure includes $8,240.94 in wages plus a "per diem" of $160.40.

Debtor's fiancé is entitled to receive monthly support payments of $850, but at the time of the hearing he was not making the payments. Therefore, when amended schedule I was filed, these payments were deleted. Debtor testified that his fiance's ex-husband is unemployed and is "on house arrest." (N.T. 35.) Debtor's fiancé did receive a lump sum payment of $6869 in November 2009 when her ex-husband sold his home.

Debtor's schedule J reports monthly expenses totaling $7906, including the mortgage payments of $3652 and vehicle payments totaling $1450[9] per month for the Uplander and the Escalade. Debtor's amended schedule J made no changes to expenses and simply recalculated disposable income.

## II. Discussion

Section 707(b) of title 11 requires a bankruptcy court to dismiss a chapter 7 case filed by an individual debtor whose debts are primarily consumer debts if granting relief would constitute an abuse of the provisions of chapter 7. When the presumption of abuse does not arise under § 707(b)(2), a case may be dismissed if the court determines that the petition was filed in bad faith or that "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C.A. § 707(b)(3).

"The UST bears the burden of proving by a preponderance of the evidence that the filing of the petition constitutes abuse in the totality of the circumstances." *In re MacNamara*, 2009 WL 1606985, *3 (Bankr. M.D. Pa.) (citing *In re Colgate*, 370 B.R 50 (Bankr. E.D. N.Y. 2007)); *In re Miller*, 335 B.R. 335 (Bankr. E.D. Pa. 2005). To identify abuse under § 707(b)(3), a court

---

[9]Based on information in exhibits admitted at the hearing, the amount reported on the schedule J for vehicle payments is incorrect and should have been reported as $1431.

must consider a debtor's future income and expenses as well as his financial circumstances when the petition was filed. *In re Lipford*, 397 B.R. 320, 328 (Bankr. M.D. N.C. 2008).

A debtor is not "expected to live in poverty to pass scrutiny in an action brought to dismiss under § 707(b)(3)." *In re McClellan*, 428 B.R. 737, 744 (Bankr. N.D. Ohio 2009) (citing *In re Fulbright*, 319 B.R. 650, 658 (Bankr. D. Mont. 2005)) (other citations omitted).) But chapter 7 debtors are expected to do some "financial belt tightening and may be required to forgo amenities to which they had been accustomed." *In re McClellan*, 428 B.R. at 744 (citing *In re Krohn*, 886 F.2d 123, 128 (6th Cir.1989)) (considering "substantial abuse" under former § 707(b) of the Bankruptcy Code).

The UST argues that Debtor is abusing chapter 7 by devoting all of his disposable income to maintaining his pre-petition lifestyle, rather than engaging in some belt-tightening so that he is able to pay at least a portion of his unsecured debt. Specifically, the UST characterizes Debtor's monthly mortgage and car payments as exorbitant and beyond that required to meet the necessary and reasonable costs of maintaining his family. The UST also asserts that it is an abuse of chapter 7 for Debtor to divert income that otherwise would be available for creditors to support his fiancé and her children. If Debtor's budget is reduced to include only necessary expenses, argues the UST, Debtor has adequate disposable income to repay a significant portion of his unsecured debt.

This Court has found the following factors to be useful when considering whether the filing of a petition is abuse under the totality of circumstances in a given case: (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; (2) whether the debtor made consumer purchases far in excess of his ability to repay; (3) whether

6

the debtor's proposed family budget is excessive or unreasonable; (4) whether the debtor's schedules and statements of current income and expenditures reasonably and accurately reflect his true financial condition; (5) whether the bankruptcy petition was filed in bad faith; (6) whether the debtor engaged in eve of bankruptcy purchases; (7) whether the debtor enjoys a stable source of future income; (8) whether he is eligible for adjustment of his debts through chapter 13 of the Bankruptcy Code; (9) whether there are state remedies with the potential to ease his financial predicament; (10) the degree of relief obtainable through private negotiations; and (11) whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities. *In re Hoffman*, 2008 WL 5158292 at *3 (Bankr. M.D. Pa. 2008) (citing *In re Krohn,* 886 F.2d 123, 126 (6th Cir. 1988); *In re Green*, 934 F.2d 568 (4th Cir. 1991)). To assess whether the filing of Debtor's petition constitutes abuse of chapter 7, I will apply the *Krohn/Green* factors to the facts of the within case.

**A.**   ***Krohn/Green* factors**

  (1)   *Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment*

The UST denies that Debtor's bankruptcy filing is attributable to sudden illness, calamity, disability, or unemployment. Debtor's testimony, however, establishes that his reduced income while he was on disability between August 2006 and August 2008 was a contributing factor. Although his disability did not result in a loss of employment, his income was reduced by approximately 50% for two years. He also experienced the personal and financial misfortune of separation and divorce while he was disabled. Further exacerbating his financial situation, Debtor engaged in a failed effort to start a real estate business during the same time period. As Debtor

7

testified, "all this debt came into being . . . during the disability time." (N.T. 26). While the schedules do not totally support that testimony (they show unsecured debts beginning to accumulate as early as 2002), most of the unsecured claims listed on schedule F were incurred between 2006 and 2008. Thus, this factor supports Debtor's assertion that the petition was filed as a consequence of a disability and, therefore, is not an abuse of chapter 7.

      (2)    *Whether the debtor made consumer purchases far in excess of his ability to repay*

Debtor's schedule F shows unsecured debts totaling $119,813. Of this amount, $79,457 is attributed to "credit card purchases." The record contains no specific information identifying how the cards were used or when purchases were made.[10] Although it is unclear from the record when the credit card debt was incurred, at filing Debtor had accumulated revolving credit in excess of his annual income for 2008.

After he had been on disability for approximately one year and had put his home on the market because he was having difficulty making the mortgage payments, Debtor and his wife purchased two new vehicles. One of these vehicles was a luxury SUV with monthly loan payments of $1128. The other was a minivan with payments of $304 per month.[11] At the time of

---

[10]In its motion, the UST averred that the majority of Debtor's debt was consumer debt. Debtor's answer admitted this averment except to the extent that the scheduled debts were attributable to Debtor's failed real estate business. Schedule F contains seven entries in which the claim is described as "business" related. The total amount of these seven claims is $25,500.

[11]Debtor still owed $51,743 on the Escalade as of the date of the petition. The outstanding balance on the Uplander loan was $13,928 on that date. According to the figures listed on Debtor's schedules, both vehicle loans were thus "upside down" – the amount owed being nearly double the market value of the vehicle in each case. Debtor's Statement of Intention states, inaccurately, that he had no debts secured by property of the estate. Thus, the Statement of Intention does not indicate whether Debtor intends to reaffirm the loan obligations or surrender the collateral. But Debtor's testimony indicated that he intends to retain the Escalade.

8

these purchases, Debtor and his former wife already were making mortgage payments of $3652 per month when their combined annual income was less than $80,000. The combined monthly payments of $1431 per month on the Escalade and Uplander, while less than the $1900 paid monthly on the BMW, Volvo, and Porsche, still demonstrate a stubborn refusal by Debtor to reduce expenses to a realistic level at a time when he clearly had inadequate income to make these payments. Debtor defended the decision to purchase the Escalade because of his lengthy commute to New York and his need for a reliable vehicle with four-wheel drive. The Court considers Debtor's explanation to be disingenuous. Debtor purchased the Escalade when he was on disability and was not commuting to New York. In fact, Debtor did not resume flying until almost a year after the purchase. Beginning as early as 2006, Debtor and his wife spent lavishly, acquiring an expensive home and a fleet of luxury cars. Once Debtor began to experience financial hardship, he reduced his spending, but he continued to use credit to acquire assets that he could not afford. Accordingly, this factor supports a finding that granting Debtor a discharge of his debts would be an abuse of chapter 7.

  (3) *Whether the debtor's proposed family budget is excessive or unreasonable and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities*

Debtor's household expenses are both excessive and unreasonable. Under Debtor's current circumstances, he cannot afford to pay for a $500,000 home, a luxury SUV, and his ex-wife's minivan. Debtor argues that he is entitled to chapter 7 relief despite his oversized monthly mortgage payment[12] because his household comprises six persons. The difficulty with Debtor's

---

[12]The IRS mortgage/rent allowance for a two-person household in Dauphin County, Pennsylvania is $914. The allowance for a six-person household is $1091. While these allowances do not set a ceiling that a chapter 7 debtor may not exceed, they are helpful to inform

9

Case 1:09-bk-06658-MDF   Doc 26   Filed 08/12/10   Entered 08/12/10 15:04:27   Desc
Main Document   Page 9 of 18

argument is that he is not obligated to support his fiancé and her children. Payments to or for the benefit of persons whom a debtor is not required to support are not considered reasonable and necessary expenses.

In *In re Staub*, 256 B.R. 567 (Bankr. M.D. Pa. 2000), the debtor was making payments of $900 a month to help support his college-age son, who was no longer a "dependent" under Internal Revenue Code standards. Judge Woodside found that the payment was not a reasonable and necessary expense because the debtor was not "compelled by judicial order" to pay it. *Id.* 256 B.R. at 570. Similarly, in *In re Miller*, 302 B.R. 495, 502 (Bankr. M.D. Pa. 2003), I sustained the UST's motion to dismiss in part because I found that the debtor was not obligated to make mortgage payments on a home owned by the debtor's mother or to pay the living expenses of his adult children. *See also, MacNamara*, *supra*, (debtors' subsidizing of adult children's auto insurance and cell phone service were not reasonable and necessary). Numerous courts outside of this District concur in this position. *See In re Meker*, 295 B.R. 625 (D. Ariz. 2003) (citing cases).

In *Meker*, the District Court for the District of Arizona held that a debtor could not claim his live-in girlfriend's four children as dependents in defense of a § 707(b) motion filed by the UST. The court rejected the debtor's argument that, in the absence of a statutory definition, the term "dependent" should be given its common meaning of "one who relies on another for support." *Id.* 295 B.R. at 629. Instead, the court held that neither the girlfriend nor her children were "dependents" of the debtor for bankruptcy purposes because "he has absolutely no legal obligation, or even moral responsibility, to them." *Id.* at 630. The court found that the debtor

---

the court as to the reasonableness of a given housing payment. *In re Hoffman*, 413 B.R. at 197.

10

had no responsibility to support his girlfriend and her children even though the children's biological father was providing no support.[13] *Id.* (citing *In re Mastromarino*, 197 B.R. 171, 178 - 79 (Bankr. D. Me. 1996)).

In *Mastromarino*, the bankruptcy court held that the case before it should be dismissed under §707(b), despite the debtor's claim that his personal commitment to pay the expenses of his girlfriend's four children rendered him unable to repay unsecured claims through chapter 13.

> I will disregard both the additional household income and the household expenses attributable to Mastromarino's choice to live with and support his domestic partner and her four children. This is not a moral judgment, but a legal one. Mastromarino has *no* obligation to support them. But he *is* legally obligated to his creditors. To grant such voluntary expenditures priority over existing legal obligations would be to permit Mastromarino unilaterally to subordinate his creditors to his personal lifestyle choices. That he may not do.

*In re Mastromarino*, 197 B.R. at 178 (italics in the original) (citations omitted).[14]

Both the *Meker* and *Mastromarino* rely upon state law to determine whether an unmarried debtor has an obligation to support a domestic partner and the children of the debtor's partner. Generally there is no legal duty to support a domestic partner under Pennsylvania law. Married couples have a duty to support each other; parents have an absolute duty to support their unemancipated, minor children; and, under certain circumstances, parents have a duty to support

---

[13] In his testimony, Debtor emphasized his personal opinion that, because of alcoholism, the father of his fiance's children has not supported his children and will never be able to help support them. Debtor's desire to serve as a surrogate father to his fiance's children is admirable, but it does not excuse his legal obligation to his creditors.

[14] *See also In re Duncan*, 201 B.R. 889 (Bankr. W.D. Pa. 1996) (relying on debtors' tax returns showing no dependents, § 707(b) motion granted where debtors claimed to support four adult children and two grandchildren residing in their household. Court found that "[s]uch support is unquestionably commendable," but held that it "should not be made at the expense of . . . creditors.")

11

their children older than eighteen. 23 Pa. C.S. § 4321.[15] However, even if a minor is not a natural or adopted child, a person may assume legal responsibility for the child under the doctrine of *in loco parentis*. "The phrase *in loco parentis* refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption." *T.B. v. L.R.M.,* 567 Pa. 222, 228, 786 A.2d 913, 916 (2001). The phrase encompasses two concepts: "the assumption of a parental status," and "the discharge of parental duties." *Id.* at 228-29, 786 A.2d at 916-17. The rights and liabilities arising out of an *in loco parentis* relationship are the same as between parent and child. *Spells v. Spells,* 250 Pa.Super. 168, 378 A.2d 879, 882 (1977). Accordingly, I find that there may be a set of circumstances in which a debtor who lives with a domestic partner and the partner's children may owe a duty to support the partner's children. However, in this case, there is insufficient evidence on the record for me to find that Debtor assumed *in loco parentis* status with regard to his fiance's children.

Finding Debtor has failed to establish that he has a duty to support his fiance's children, I conclude that Debtor cannot justify his mortgage expense by claiming that it is necessary to house six persons. Further, even if I did find that Debtor was entitled to support a family of six persons, adequate shelter could be provided in a less luxurious home at a significantly lower monthly amount.

---

[15]Under Pennsylvania law, parents have a duty to support their children until they complete high school regardless of whether they are older than eighteen. *Blue v. Blue*, 532 Pa. 521, 616 A.2d 628 (1992). A parent who has a child who wishes to attend college and who is capable of successfully pursuing a college degree has a duty to assist the child in attending college if the parent can afford to do so without suffering "undue hardship." *Commonwealth ex. rel. Ulmer v. Sommerville*, 200 Pa. Super. 640, 643-44, 190 A.2d 182, 184 (1963).

12

"A debtor's budget may be excessive or unreasonable based on a high mortgage payment." *In re Myers*, 2009 WL 1456921, *4 (Bankr. M.D. N.C.) (citing *In re Crink*, 402 B.R. 159, 170 (Bankr. M.D. N.C. 2009); *In re Shaw*, 310 B.R. 538, 541 (M.D.N.C.2004); *In re Vansickel*, 309 B.R. 189 (Bankr. E.D. Va. 2004)) (other citations omitted). Debtor's monthly mortgage payment of $3651 is more than three times the IRS allowance for a family of six, even assuming that Debtor were permitted to deduct expenses related to his fiancé and her family. When compared to the IRS allowance of $918 for a family of two (Debtor and his daughter), Debtor's mortgage payment is clearly excessive.

In this case, Debtor's mortgage payment not only is too high when compared to the IRS standard allowance, it also is unrealistic when examined as a percentage of his current household income. *See In re Hornung*, 425 B.R. 242 (Bankr. M.D. N.C. 2010) (§707(b)(3) motion granted where debtors did no "financial belt-tightening" but filed petition in effort to retain "recently-purchased home that they could not afford"). Debtor's net monthly income at the time of the hearing was $6967. His monthly mortgage payment of $3652 consumes more that half of that amount, which is excessive.

Debtor's car payment also is excessive. While he certainly requires reliable transportation for his commute to and from New York, this need could be met for much less than the $1128 per month he is paying for the Escalade.

(4) *Whether the debtor's schedules and statements of current income and expenditures reasonably and accurately reflect his true financial condition*

The motion to dismiss avers that schedule I filed with Debtor's petition under-reported his income. A few weeks after the UST's motion was filed, Debtor amended the schedule to

13

increase the gross and net monthly income figures by several hundred dollars each. At the hearing, the UST moved to amend its motion to adopt the same figures as stated in Debtor's amended schedule I. Accordingly, there is no dispute that amended schedule I reflects debtor's true financial condition.

As to schedule J, the UST avers that Debtor's expenses are inflated because some amounts are unnecessary and unreasonable. However, those expenses were accurately reflected on schedule J, and Debtor's schedule I has been amended to a more accurate figure. Although the initial amounts reported on the statement of income were incorrect, I find the errors were not intentional and do not suggest that Debtor's chapter 7 petition was improperly motivated or otherwise abusive of the chapter.

(5) *Whether the bankruptcy petition was filed in bad faith.*

The UST does not argue that the petition was filed in bad faith, and no evidence was produced that the case was filed in bad faith.

(6) *Whether the debtor engaged in eve of bankruptcy purchases.*

"Eve of bankruptcy" is a flexible concept not defined in terms of a set period of days, weeks, or months but dependent on the facts of each case. Generally it is applied to purchases made while bankruptcy looms large on the debtor's financial horizon – when a debtor continues to use unsecured credit to acquire goods and services while contemplating a bankruptcy filing. For example, in *In re Wilson*, 125 B.R. 742, 745 (W.D. Mich. 1990), a debtor's purchase of $959 worth of jewelry within three days of visiting the attorney who ultimately filed her bankruptcy petition was considered to be a "classic example" of an "eve of bankruptcy" purchase. *Id.* In *In re Deutscher*, 419 B.R. 42 (Bankr. N.D. Ill. 2009), debtors purchased a 42-foot yacht for

14

Case 1:09-bk-06658-MDF    Doc 26    Filed 08/12/10    Entered 08/12/10 15:04:27    Desc
Main Document    Page 14 of 18

$177,782 approximately fourteen months before filing their chapter 7 petition. The bankruptcy court considered whether the purchase could be regarded as an "eve of bankruptcy" purchase, having been made more than a year before the filing. Although it noted that the payments on the yacht alone consumed "nearly a third of the Debtors' scheduled average monthly income[,]" the court concluded that "the length of time was probably too long to count as 'on the eve of bankruptcy.'" *Id.* at 46.

Debtor's purchase of two expensive motor vehicles when he was on disability was extravagant. But their acquisition, two years before the petition was filed, is too far removed from the inception of the case to be considered "eve of bankruptcy" purchases. Further, there is some justification for their purchase because Debtor actually reduced, rather than increased, his vehicle expenses. Therefore, I do not find that this factor supports a finding of abuse.

      (7)     *Whether the debtor enjoys a stable source of future income*

Debtor had been employed as a pilot for eight years prior to the filing of his bankruptcy petition. He continued to receive a portion of his salary from his employer even while he was disabled for a period of two years. His testimony did not establish that his future career with the airline was in jeopardy, or that his general employment prospects as a commercial airline pilot were threatened in any significant way.

      (8)     *Whether the debtor is eligible for adjustment of his debts through chapter 13 of the Bankruptcy Code*

Debtor is eligible for adjustment of his debts through chapter 13. At the trial of this matter, Debtor indicated a willingness to convert this case to chapter 13 if the Court determined that the filing of his chapter 7 case was an abuse of the chapter.

15

If I were considering the UST's motion on only the factors stated above, I would find that there is insufficient evidence to support dismissal of Debtor's case. Debtor made consumer purchases in excess of his ability to pay, but without more, I give little weight to this factor. Debtor's budgeted expenses are excessive, but unless by reducing expenses Debtor is able to repay either a significant percentage of his total unsecured debt or a significant amount of debt, dismissal would not be appropriate. Therefore, it is appropriate to now consider whether Debtor can repay a significant amount of his debt once he makes appropriate cuts to his budget.

**B.    Ability to pay**

The only expenses placed at issue by the UST were Debtor's mortgage payment and vehicle expenses.[16] When a mortgage payment is too high, a more reasonable amount will be used to calculate whether a debtor has disposable income available that could be committed to funding a chapter 13 plan. *See, e.g., In re Welch*, 344 B.R. 50, 55 (Bankr. M.D. Pa. 2005) (debtors expected to reduce $2712 mortgage payment where applicable IRS standard for debtors was $918); *In re Hoffman*, 413 B.R. at 197 (debtor compelled to reduce $2338 monthly housing expense where applicable IRS standard was $983); *In re MacNamara*, 2009 WL 1606985, at *4 (debtors who were paying more than 30% of their income on housing and whose monthly payments were more than four times greater than applicable IRS standard could be expected to find suitable rental housing). The UST has urged the Court to require Debtor to limit his housing expense to the guideline limits for Dauphin County. Although the Court will not require Debtor, who currently lives in Hershey, to conform strictly to the county standard, Debtor does not need

---

[16]Although this issue was not addressed by the UST, I found it difficult to justify Debtor's inclusion in his budget of $100 per month in child care considering that Debtor's fiancé does not work outside the home.

16

to maintain a $500,000 home to provide adequate housing for his family. At a minimum, Debtor should be able to reduce his housing costs by one-third, or approximately $1200, even if he continues to live with his fiancé and her children. It also is unreasonable for Debtor to continue to include the $304 monthly payment on the Uplander in his budget when the vehicle is in the possession of his ex-wife, it is her responsibility under the divorce settlement, and it is not necessary to maintain his household. These two adjustment would lower Debtor's expenses by approximately $1500 per month and leave Debtor with more than $560 per month to devote to a chapter 13 plan.[17]

Debtor reported on schedule F that he has $119, 813 in unsecured debt, and he reported no priority, unsecured debt. If Debtor committed $560 per month to a chapter 13 plan for sixty months Debtor would be able to pay $33,600 or 28% of his unsecured debt.

### III. Conclusion

Accordingly, based upon a consideration of the totality of the circumstances, I find that the filing of this case constitutes an abuse of chapter 7. The motion to dismiss will be granted

---

[17] Further reduction in expenses are appropriate. Debtor should be able to lower his vehicle expenses if he surrendered his Escalade in favor of a less luxurious vehicle. However, there was inadequate evidence on the record for the Court to determine an appropriate monthly payment for such a vehicle or even whether Debtor would be able to lease or purchase such a vehicle considering his current lack of creditworthiness. Also, I am unable to determine a precise appropriate housing allowance for Debtor's future needs because it is uncertain how Debtor will address the finding that he failed to establish that he had an obligation to support his fiancé or her children.

unless Debtor moves to convert the case to chapter 13 within ten days of the date of the Order accompanying this Opinion.

By the Court,

*/s/ Mary D. France*
Chief Bankruptcy Judge

Date: August 12, 2010

*This document is electronically signed and filed on the same date.*